## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| CASH TODAY LLC, et al., | |
| *Plaintiffs,* | |
| vs. | Case No. 21-2360-EFM |
| MTE LLC, et al., | |
| *Defendants.* | |

### MEMORANDUM AND ORDER

Plaintiffs Cash Today, LLC ("Cash Today") and MoneyBox ATM Nevada, LLC ("MoneyBox") bring numerous claims against Defendants MTE, LLC ("MTE") and Michael W. Tyler, Sr. ("Tyler") arising from the purchase and operation of an automated teller machine ("ATM") business in Las Vegas, Nevada. This matter came for bench trial on August 13, 2024. The Court has thoroughly considered the evidence and arguments presented at trial, the parties' post-trial submissions, and the relevant law, and makes the following findings of fact and conclusions of law as required by Rule 52(a) of the Federal Rules of Civil Procedure.

### I.        Findings of Fact

**A.        The Parties**

1.        Plaintiff Cash Today is an Arizona limited liability company whose sole member is Sue Klopf.

2.      Plaintiff MoneyBox is a Nevada limited liability company whose sole member is Patrick Klopf.

3.      Patrick Klopf is Sue Klopf's son.  Michael Klopf was also Sue Klopf's son. Michael Klopf died on July 20, 2020.

4.      Defendant MTE is a Kansas limited liability company whose controlling member and manager is Michael W. Tyler, Sr.

**B.      Sale Discussions and the Sale**

5.      In March 2019, MTE owned or operated 59 ATMs in Las Vegas, Nevada.

6.      MTE owned 44 of these ATMs and acted as a cash loader for the remaining 15 ATMs.

7.      In early March 2019, Tyler, Patrick, and Michael discussed Tyler selling MTE's Las Vegas ATM assets to their mother's company, Cash Today.

8.      An Asset Purchase Agreement ("APA") dated March 11, 2019, was signed by Sue on behalf of Cash Today.

9.      The APA specified that Cash Today would purchase MTE's ATM assets for $615,000.

10.      The APA—admitted as Exhibit 6—reads as follows:

This is a document detailing the purchase of MTE Platinum Cash LLC, a Las Vegas Nevada company by Cash Today LLC. The sale price is $615,000 U.S. currency and shall be closed on 01/15/2019 or sooner in Las Vegas, NV. Upon closing, MTE shall transfer all contracts, equipment, placements, and information it currently owns or controls.

MTE also shall provide $200,000 vault cash, 3 weeks of employee training and 2 months of accounting/bookkeeping services.

Cash Today LLC agrees to maintain all equipment at its own expense as soon as closing and not hold MTE liable for any reason during training period.

MTE shall allow Cash Today access to the online Process (Columbus Data Systems) to monitor all machines at all times. MTE shall also pay $13,000 bonus/sign on money to Z-Marts to complete the contract signed in January 2019. MTE also will pay for and provide 2 months of wireless communication devices to Cash Today. MTE sells all assets without warranty. Cash Today holds MTE harmless.

Cash Today is free to move the processing to any provider it chooses and is under no contracts previously agreed to by MTE. Cash Today is in no way liable for any debt incurred by MTE prior to closing. MTE shall not be liable for any debt incurred by MTE/Cash Today after closing.

11.    There are two signature lines at the bottom of the APA. One is signed "Sue Klopf Cash Today LLC" and is dated March 11, 2019. The other signature line is left blank and was never signed.

12.    At 10:49 a.m. on March 11, 2019, Michael sent a copy of the signed APA to a group chat with Tyler and Patrick via text message.

13.    Tyler testified that he received the APA via text message, but he never opened, read, or reviewed the terms of the APA. He further testified that he communicated with Michael on March 11, 2019, and came to a different agreement than the terms of the APA. Tyler claims that he and Michael agreed that Michael would cash load the ATMs on behalf of MTE, and there was never an agreement for the purchase any of MTE's ATM assets. No documents of this alternative agreement exist.

14.    However, on March 11, 2019, shortly after receiving the text with the APA, Tyler responded by texting: "I have the wire instructions available. When do you plan on closing/transferring money?"

15.    Tyler also texted a picture of wire instructions for MTE's account.

16.    On March 13, 2019, Cash Today made a wire transfer payment in the amount of $145,000 to MTE's account, and Sue made a wire transfer payment in the amount of $470,000 to MTE's account.

17.    These wire transfer payments totaled $615,000, which was the purchase price identified in the APA.

18.    The wire transfer payments identified the payee, "MTE LLC, Michel Tyler Jr", as "Seller of Business" and the purpose of the wire as "Business Purchase."

19.    Tyler notified Patrick and Michael via text that he received payment of the $615,000 payment and then stated, "I'll see you in the morning."

20.    Tyler and Michael met in Las Vegas to move forward with the transaction.

21.    On March 19, 2019, Michael was added as an authorized signer to MTE's Nevada State Bank cash vault account.

22.    Michael utilized MTE's Nevada State Bank cash vault account to supply ATMs with the cash necessary for their operation. These ATMs included the 59 ATMs owned or operated by MTE prior to March 13, 2019, as well as 12 other ATMs operated in Las Vegas by Michael independent of the APA.

23.    Cash Today verbally agreed that MoneyBox would receive all the rights regarding the sale of MTE's ATM assets and this lawsuit.  No details or documentation of this assignment were presented.

24.    Dennis J. Desmond, Jr., provided accounting and tax preparation services for MoneyBox relating to the sale of MTE's assets and subsequent operations.

25.    MoneyBox treated the APA transaction as a sale on its 2019 tax return and subsequent tax returns.

**C.      Business Operations After the Sale**

26.      Michael managed the day-to-day operations of MoneyBox's ATM assets in Las Vegas and Arizona. The ATM assets in Arizona were acquired by Moneybox prior and independent of the ATM assets acquired in Las Vegas.

27.      When an ATM processes a transaction, it charges a surcharge fee for the use of the ATM services. The surcharge fee is split according to the ATM contracts. It can be split between the ATM operator, the cash loader, the merchant, etc.

28.      MoneyBox received all surcharge revenue relating to ATM transactions from March 2019 to November 2020, except for minimal surcharge that was paid to MTE for the ATM locations that MTE procured.

29.      MoneyBox wrote checks to its ATM customers for their portion of the surcharge.

30.      From March 2019 to July 2020, Michael lost 18 of the ATM contracts acquired from MTE.

31.      Prior to the sale, Eddie Unger was employed by MTE as a cash loader. MoneyBox continued to employ Unger as a cash loader after the sale.

32.      At Tyler's recommendation, MoneyBox used SwypCo, an independent sales organization, to process the ATM transactions for its ATM assets in Las Vegas.

33.      Tyler advised Michael to not tell merchant customers of the change of ownership from MTE to MoneyBox.

34.      SwypCo placed MoneyBox within the "tree" of MTE. As such, MTE had access to the SwypCo reports of MoneyBox's ATM assets.

35.      Michael and Tyler would exchange text messages regarding the operation of the Las Vegas ATMs. Tyler's text messages to Michael included remarks such as: "Nu Leaf called me

at 1:30 this morning and said their machine was down. One of their machines was down. Good Luck"; "Expressions café has some sort of problem. Thanks"; "Hope it works, I don't mind getting called this late"; "Marquis number three – the one by the pool is out of money. National Link called me"; "Several locations look like they might need a reset. Good Luck."

36.    In December 2019, MoneyBox opened a new vault cash account at Nevada State Bank. MoneyBox transferred the vault cash from the account in MTE's name to this new account, which was in MoneyBox's name. MoneyBox utilized the new vault cash account to load its ATMs with cash from that time forward.

37.    After this transfer of bank accounts, Eddie Unger no longer assisted Michael with providing cash loading services for MoneyBox. Instead, Clint Hutchison, a friend of Michael's, began assisting Michael with providing cash loading services for MoneyBox.

38.    Hutchison believed that MoneyBox owned the ATM assets in Las Vegas and Arizona, excluding the few that were cash loaded for third parties.

39.    In June 2020, Tyler procured a new contract with Z-Mart for the right to place an ATM at Z-Mart's locations. The contract was between Z-Mart and MTE; however, MoneyBox paid the purchase price required by the contract. Tyler received minimal interchange amounts from the Z-Mart machines.

## D.    Business Operations After Michael's Death

40.    On July 20, 2020, Michael passed away in a car accident.

41.    Immediately following Michael's death, Patrick stepped into the role of day-to-day operations. Hutchison continued to provide cash loading services for MoneyBox at that time.

42.    After several months, Hutchison decided that he did not wish to continue to cash load.

43.    Tyler introduced MoneyBox to Travis Mizer as a replacement cash loader. MoneyBox utilized Mizer to cash load its ATMs in Las Vegas. As a cash loader, Mizer interfaced with MoneyBox's customers, cash loaded the machines, and provided checks to the ATM customers.

44.    MoneyBox agreed that Mizer would use his personal cash to cash load the ATMs. As part of their agreement, Mizer and Hutchison visited each ATM and swapped MoneyBox's cash for Mizer's cash. Once MoneyBox's cash was swapped for Mizer's cash in an ATM, the cash would vault to Mizer's vault cash bank account. Because it was Mizer's cash involved he got a piece of the interchange amounts.

45.    The process of switching MoneyBox's cash over to Mizer's cash took over two and a half months. MoneyBox introduced Mizer to SwypCo and gave Mizer complete control over the ATMs, including the ability to change passcodes. MoneyBox no longer maintained physical access to the ATMs.

46.    Columbus Data Services, LLC ("CDS") is a company that, among other things, tracks and reports transactions processed through third parties. MoneyBox utilized CDS's services for transactions processed through SwypCo.

47.    Tyler assisted Moneybox during the transition from Michael running the day to day operations to Patrick running the day to day operations. Tyler was paid $1,000 for his services, including the procurement of Mizer as a replacement cash loader. MoneyBox provided Tyler all login and access information for its account with CDS, along with other spreadsheets and information when Tyler requested them. As such, Tyler had access to and information about all of MoneyBox's ATMs, ATM locations, ATM customers, and ATM operations.

**E.     MoneyBox's efforts to sell Las Vegas ATM assets**

48.     MoneyBox decided to explore selling its ATM business. Information about a possible sale was posted on a Facebook Marketplace ATM page.

49.     Tyler learned of the Facebook post and requested that Patrick give him permission to advise an interested purchaser that Patrick simply had a bad night and that the ATM assets were not for sale. Patrick agreed to Tyler telling the interested purchaser that the ATM assets were not for sale. Tyler did not assert that MTE still owned those ATM assets when Patrick began exploring selling them.

50.     As of November 2020, MoneyBox had 38 total ATM assets in Las Vegas, including 13 ATM assets that were procured independent of the APA. From September 2019 to September 2020, these Las Vegas ATM assets were collectively netting profits of approximately $7,700 per month.

51.     In November 2020, an ATM broker, ATM Brokerage LLC, recommended that MoneyBox list its Las Vegas ATM assets at $350,000.

52.     In early November 2020, MoneyBox ultimately offered to sell its Las Vegas ATM assets to Mizer for $300,000.

53.     Tyler interjected himself into the sale discussions between MoneyBox and Mizer. Tyler negotiated terms of a purchase price of $250,000 for MoneyBox's Las Vegas ATM assets between MoneyBox and Mizer. However, Mizer never signed off on this transaction.

**F.     Loss of Access to the ATM accounts**

54.     In mid-November 2020, Patrick had nose surgery. The surgery's recovery period lasted about a week.

55.     On November 6, 2020, MTE entered into a Cash Loader Agreement with Mizer to provide cash loading services for ATM locations in Las Vegas. The agreement with Mizer to cash load for MTE was memorialized in writing. Mizer did not tell MoneyBox about this new agreement to cash load for MTE.

56.     After he recovered, Patrick sought to login into the CDS portal through the SwypCo account to check on MoneyBox's ATM operations. He discovered he was locked out from viewing information on MoneyBox's ATM accounts.

57.     Patrick reached out to Mizer and asked why he was locked out. Mizer told Patrick to talk to Tyler.

58.     Patrick reached out to Tim Baxter at SwypCo to ask why he was locked out of the ATM accounts. Baxter restored Patrick's access to the Iowa and Arizona ATM accounts but not the Las Vegas accounts. Baxter told Patrick to refer his questions concerning the Las Vegas ATM accounts to Tyler.

59.     Tyler did not initially respond to Patrick's attempts to ask why he was locked out of MoneyBox's Las Vegas SwypCo account and thus the CDS portal.

60.     On December 1, 2020, Patrick sent Tyler an email asking Tyler to execute a document that would finalize MoneyBox's 2019 purchase from MTE. Patrick wanted Tyler to execute this document to address Mizer's concerns with buying MoneyBox's Las Vegas ATM assets, and thus, be able to move forward with the sale to Mizer.

61.     That same day, Tyler sent Patrick a text message that stated:

"This is a notice from Toby Tyler of MTE platinum cash LLC that I am canceling my cash loading agreement with Michael Klopf. After Michael's tragic passing the business has lost several accounts and quite a bit of volume. I have removed your wireless devices and will send them back to the warehouse or to wherever you want me to. Sorry that it has come to this but I feel this is the best path forward."

62.     After Tyler sent Patrick the text message, Patrick and Tyler had several conversations over the phone. In a phone call, Tyler advised Patrick that he was going to tell him something that "will shock you." Tyler then went on to explain that he had he contacted Las Vegas ATM locations that were customers of MoneyBox and obtained new contracts between the customers and MTE.

63.     MoneyBox could not access its Las Vegas ATM assets and was unable to sell those assets to Mizer.

## G.     Procedural History

1.     Plaintiffs filed the present case on August 19, 2021.

2.     Plaintiffs originally asserted claims against MTE for breach of contract, fraud and fraudulent misrepresentation, equitable recission, recission based on mutual mistake, unjust enrichment, tortious interference with business relationships, conversion, and deceptive trade practices. Plaintiffs also asserted claims against Tyler for fraud and fraudulent misrepresentation, tortious interference with business relationships, conversion, and deceptive trade practices.

3.     On May 5, 2024, the Court found that Kansas law applies to the unjust enrichment claim and Nevada law governs the remaining claims.

4.     The Court granted summary judgment to MTE on the conversion claim on May 5, 2024. All other claims proceeded to trial.

5.     A bench trial commenced on August 13, 2024.

6.     During trial, the Court heard from the following witnesses presented by Plaintiffs: Sue Klopf; Patrick Klopf; Clint Hutchison; Dennis J. Desmond, Jr.; George Peterson; Defendant Tyler; Travis Mizer by deposition transcript; and Cynda Campbell by deposition transcript.

7.      After Plaintiffs rested their case, Defendants moved for Directed Verdict.

8.      The Court took the Motion for Directed Verdict under advisement.

9.      Defendants presented the following witness: Defendant Tyler.

10.     The trial lasted three days, concluding with closing arguments on August 15, 2024. At the close of trial, the Court instructed the parties to submit proposed findings of fact and conclusions of law by September 30, 2024, with responses due by October 14, 2024.

11.     The Court granted a Joint Motion for Extension of Time and instructed the parties to submit their proposed findings of fact and conclusions of law by October 20, 2025, with responses due November 14, 2024.

12.     The parties have submitted their respective proposed findings of fact and conclusions of law. This matter is fully ripe for the Court's ruling under Federal Rule of Civil Procedure 52(a).

## II.      Conclusions of Law

### A.      Breach of Contract

Plaintiffs raise a breach of contract claim against MTE for violating the APA. Under Nevada law, "a breach of contract claim requires (1) the existence of a valid contract, (2) a breach by the defendant, and (3) damage as a result of the breach."[1]

#### 1.      The Existence of a Valid Contract

"Basic contract principles require, for an enforceable contract, an offer and acceptance, meeting of the minds, and consideration."[2] "A contract has a binding force based upon the fact that

---

[1] *Contreras v. Am. Fam. Mut. Ins. Co.*, 135 F. Supp. 3d 1208, 1224 (D. Nev. 2015) (citing *Richardson v. Jones*, 1 Nev. 405, 409 (1865)) (further citations omitted).

[2] *May v. Anderson*, 119 P.3d 1254, 1257 (Nev. 2005).

it evidences a meeting of the minds of two parties in good faith."[3] "[T]o enforce a contract at law, the offer must be sufficiently definite or must call for such definite terms in the acceptance, that the performance required is reasonably certain."[4] Performance constitutes an acceptance if the offeree does not exercise reasonable diligence to notify the offeror of non-acceptance within a reasonable time.[5]

At the outset, the Court notes that the basis of this lawsuit—the sale of ATM assets—was an extraordinarily poorly documented transaction by both parties. Plaintiffs' evidence that the agreement was for the sale of MTE assets is astonishingly thin, but Defendants' evidence and arguments rebutting Plaintiff's evidence was all but non-existent and was simply unbelievable.

Plaintiffs presented evidence that Michael sent the APA to Tyler that was signed by Sue Klopf of Cash Today. There is no evidence that Tyler or MTE ever signed the APA. However, after Tyler received the APA, he sent instructions to Michael and Patrick regarding the money transfer. He did not include in his instructions the amount of money that should be sent. The APA detailed that the purchase price for MTE's ATM assets was $615,000. Cash Today's and Sue's wire transfer identified "MTE LLC, Michael Tyler Jr" as the "Seller of Business" and listed the purpose of the wire transfer as "Business Purchase." MTE, through Tyler, accepted the wire transfers of money totaling $615,000 without any complaint or attempts to "correct" Plaintiffs' belief that the money was for the purchase of MTE's ATM assets. Additionally, Michael met Tyler

---

[3] *Aerial Lumber Co. v. United States*, 239 F.2d 906, 907 (9th Cir. 1956).

[4] *Laguerre v. Nev. Sys. of Higher Educ.*, 837 F. Supp. 2d 1176, 1180 (D. Nev. 2011) (quotation omitted).

[5] *United States ex rel. Am. Gen. Constr., Inc. v. Yack Constr., Inc.*, 2019 WL 4724290, at *3 (D. Nev. Sept. 25, 2019) (quoting Restatement (Second) of Contracts § 53 (1981)).

in Las Vegas after the transfer of money was received. Michael was added as an authorized signer to MTE's cash vault account and managed the day-to-day operations of the ATM assets.

MTE argues there was no contract for the purchase of its ATM assets because it never signed the APA and instead asserts that the parties had a verbal agreement for Michael serve as the cash loader for MTE's machines. Tyler testified that although he received the APA via text message, he never opened, read, or reviewed the terms of the APA. He further stated that he had communicated with Michael the same day the APA was sent to him, and the parties came to a different agreement: instead of purchasing MTE's ATMs, Michael would serve as MTE's cash loader and MTE would remain the owner of the machines. The Court finds this testimony self-serving, incredible and unworthy of belief as Defendants fail to provide evidence to support Tyler's assertions. The cash loading agreement MTE executed with Mizer was memorialized in writing. Whereas the agreement alleged by Defendants to cash load between MTE and Michael was oral and conveniently for the exact amount of money that the APA specified. The Court declines to find that the agreement was a cash loading agreement as there is no evidence to support Tyler's self-serving assertions.

Here, the APA's terms to purchase MTE's ATM assets for $615,000 constitutes an offer. MTE never signed the APA; however, it did accept wire transfers of money totaling $615,000 that identified the purpose as "Purchase of Business." Further, MTE gave Michael access to the cash vault account and allowed him to take over managing the operations of the ATM assets. This constitutes a meeting of the minds and acceptance by performance. Consideration also exists as the $615,000 was exchanged for MTE's ATM assets. As such, Plaintiffs have established by a preponderance of the evidence that the parties' agreement was for an asset purchase and was not

for cash loading. Accordingly, the Court finds that the parties had a valid contract for Plaintiffs'

purchase of MTE's ATM assets.

2.    *Breach by MTE*

Contracts are construed from the written language of the document and enforced as

written.[6] Moreover, "[f]ailure to perform one's obligations within the express terms of an

agreement constitutes a literal breach of contract."[7] Similarly, an obligation that is not within the

contract cannot be breached by a party.[8]

Here, the APA stated that "[u]pon closing MTE shall transfer all contracts, equipment,

placements, and information it currently owns or controls." Initially, MTE complied with the APA

by giving Michael access to the cash vault account and allowing him to manage the ATM

operations. However, Tyler instructed Michael not to tell the customers about the sale. Moreover,

after Michael's death and Patrick's surgery, MTE shut Plaintiffs out of the ATM operations and

asserted control over those ATM assets. When MTE relinquished control over its ATM assets in

the APA, it also relinquished control over the customer contracts associated with those ATM

assets. Despite this, MTE usurped Plaintiffs' customer contracts by directly approaching those

customers and reestablishing the contracts it had agreed to sell. In essence, MTE reasserted its

possession and control over the ATM assets purchased by Plaintiffs instead of leaving those assets

within Plaintiffs' possession and control. It was able to do this because the customers had never

been advised of the sale by MTE to Plaintiffs, at Tyler's precise direction.  These actions are the

---

[6] *See Ellison v. Cal. State Auto. Ass'n*, 797 P.2d 975, 977 (Nev. 1990).

[7] *Saini v. Int'l Game Tech.*, 434 F. Supp. 2d 913, 923 (D. Nev. 2006).

[8] *See Contreras*, 135 F. Supp. 3d at 1224 (holding that contract law was not suited to address plaintiff's claims because no contractual provision covered the alleged conduct).

direct opposite of what MTE was required to do by the APA. This constitutes a literal breach of contract.

MTE argues that there is no breach because the contract was a cash loading agreement not a sale of ATM assets. As discussed above, the Court finds this argument wholly unbelievable and incredible. Therefore, the Court finds by a preponderance of the evidence that MTE breached the APA.

> 3.    *Damage as a Result of the Breach*

"In the determination of the amount of damages recoverable by reason of breach of contract, the law attempts to place the nondefaulting party in the position it would have occupied had the contract been performed."[9] Consequential damages may be claimed by a party if the damages were foreseeable.[10] In order to be foreseeable, the damages must arise naturally and reasonably from the breach of the contract.[11] Further, lost profits may be claimed by a party in a breach of contract action.[12] "Lost profits are what the profits would have been had the contract not been breached."[13] The lost profits must be reasonably ascertainable in order to be recoverable.[14]

Here, Plaintiffs purchased MTE's ATM assets for $615,000. Plaintiffs operated the ATM business from March 2019 to November 2020, utilizing the assets gained from MTE and other assets Plaintiffs independently gained. In November 2020, MTE asserted control over the ATM

---

[9] *Stearns' Props. v. Trans-World Holding Corp.*, 492 F. Supp. 238, 243 (D. Nev. 1980).

[10] *Andrew v. Century Sur. Co.*, 134 F. Supp. 3d 1249, 1259 (D. Nev. 2015).

[11] *Verifone, Inc. v. A Cab, LLC*, 2015 WL 6443126, at *2 (D. Nev. Oct. 23, 2015) (citations omitted).

[12] *Brown v. Kinross Gold U.S.A., Inc.*, 531 F. Supp. 2d 1234, 1244 (D. Nev. 2008).

[13] *Id*.

[14] *El Ranco, Inc. v. First Nat. Bank of Nev.*, 406 F.2d 1205, 1218 n.18 (9th Cir. 1968) (noting that the rule against recovery of lost profits of new business ventures is inapplicable when profits are reasonably ascertainable).

assets that Plaintiffs gained from the APA and other independent transactions. However, by the time MTE asserted control over the ATM assets, Plaintiffs had transitioned from the use of its own vault cash to Mizer's vault cash. Thus, the foreseeable damages that arise naturally and reasonably from the breach of contract would be the value of the ATM assets that were repossessed from Plaintiffs' initial purchase.

In March 2019, Plaintiffs purchased approximately 59 Las Vegas ATMs owned or cash loaded by MTE in accordance with the APA. During the time that Plaintiffs operated the ATM business, they lost several ATM accounts. As of November 2020, Plaintiffs had 38 total ATM assets in Las Vegas, including 13 ATM assets that were procured independent of the APA. When MTE took over the ATM assets it also took over the assets that were procured independent of the APA. However, under the breach of contract theory, Plaintiffs can only recover for the assets that were acquired through the APA. Therefore, Plaintiffs can only recover for the 25 Las Vegas ATM assets that remained from the initial purchase under the APA when MTE breached the contract asserted control over them.

A plaintiff can recover the market value of the property on the date of the breach.[15] MTE asserted control over Plaintiffs' 38 Las Vegas ATM assets in November 2020. Plaintiffs' Las Vegas ATM assets were valued at $350,000 by an ATM broker in November 2020. The appraised amount of $350,000 includes 13 ATM assets that were procured independently of the APA. When MTE took over the ATM assets, it also took over the assets that were procured independently. However, under the breach of contract theory, Plaintiffs can only recover for the ATM assets that

---

[15] *Stearns' Props.*, 492 F. Supp. at 244.

were acquired under the contract. As such, the Court must calculate the value of the remaining 25 Las Vegas ATM assets purchased from the APA.

The Court recognizes that some ATM assets might be worth more than others. However, neither party provides evidence of what individual assets were specifically worth. Consequently, the Court will calculate the value of the ATM assets by equally dividing the $350,000 appraisal amount between the ATM assets. The appraised amount, $350,000, divided by the total number of Las Vegas ATM assets, 38, is approximately $9,210.53 per ATM asset. Because 25 Las Vegas ATMs remained from the APA, the Court multiplies $9,210.53 by 25 for a total of $230,263.25. Thus, Plaintiffs are entitled to $230,263.25 in consequential damages for MTE's breach of contract.

Additionally, Plaintiffs can recover lost profits from the breach of contract. Patrick testified extensively about the gross profits the ATM assets were generating and the various expenses that would be subtracted from the gross figure. From September 2019 to September 2020, Plaintiffs' Las Vegas ATM assets were netting profits of approximately $7,700 per month. Those net profits are from Plaintiffs' operation of 38 Las Vegas ATM assets.

The Court again notes that some ATM assets may have been more lucrative than others; however, neither party provides evidence of what each asset was specifically netting for profits. As such, the Court will calculate the net profits of the ATM assets by equally dividing the $7,700 net profits per month between the ATM assets. The net profits per month, $7,700, divided by the number of Las Vegas ATM assets, 38, is $202.63. Thus, each Las Vegas ATM asset nets approximately $202.63 of profit each month. As noted above, 25 of those Las Vegas assets remained from the APA. Therefore, the Court multiplies $202.63 by 25 for a total of $5,065.75.

Accordingly, Plaintiffs are entitled to lost profits of $5,065.75 per month from December 2020 to the date of the entry of final judgment in this matter, which is $263,419 through April 21, 2025.

The Court enters judgment in favor of Plaintiffs on the breach of contract claim and awards plaintiffs $230,263.25 of consequential damages and $263,419 of lost profits. However, the Court is completely without information as to how to allocate the damages from the breach of contract between Cash Today and MoneyBox.

Plaintiffs claim that Cash Today assigned its rights over the sale of MTE's ATM assets and this lawsuit to MoneyBox. Under Nevada law, in the "absence of statute or a contract provision to the contrary, there are no prescribed formalities that must be observed to make an effective assignment."[16] However, the assignor must "manifest a present intention to transfer its contract right to the assignee for a valid assignment to occur."[17] The only evidence Plaintiffs provide is conclusory testimony from Sue and Patrick that the interests of Cash Today were transferred to MoneyBox. However, no documentation of such an assignment or written assignment was produced. As such, the Court finds there was no evidence regarding the details of the assignemnt. Nonetheless, the nature of this case is such that the rights of Cash Today and MoneyBox are more intertangled than a cat's favorite ball of yarn. Thus, the Court cannot allocate the damages award between Plaintiffs and directs Plaintiffs to do so themselves.

---

[16] *Easton Bus. Opportunities v. Town Exec. Suites*, 230 P.3d 827, 832 (Nev. 2010) (quoting 9 *Corbin on Contracts* § 47.7, at 147).

[17] *Wells v. McMahon*, 2019 WL 1779566, at *6 (D. Nev. Apr. 22, 2019) (citation omitted).

## B.    Recission and Unjust Enrichment

Because the Court found there was a breach of contract, Plaintiffs' claims against MTE for equitable recission, recission based on mutual mistake, and unjust enrichment are barred by the doctrine of double recovery.[18] Consequently, Plaintiffs cannot recover under these theories.

## C.    Fraud and Fraudulent Misrepresentation

Plaintiffs raise a fraud and fraudulent misrepresentation claim against MTE and Tyler. Under Nevada law, a fraudulent misrepresentation claim requires the plaintiff to prove by clear and convincing evidence:

> (1) A false representation made by the defendant; (2) defendant's knowledge or belief that its representation was false or that defendant has an insufficient basis of information for making the representation; (3) defendant intended to induce plaintiff to act or refrain from acting upon the misrepresentation; and (4) damage to the plaintiff as a result of relying on the misrepresentation.[19]

If a plaintiff fails to establish one of these elements, the claim fails as a whole.[20]

Here, Plaintiffs fail to provide evidence that Defendants made a false representation, and that Defendants intended to induce Plaintiffs to act or refrain from acting upon such false representation. Plaintiffs argue Defendants fraudulently misrepresented that MTE was selling all of its Las Vegas ATM assets, would relinquish control over those assets, and placed Plaintiffs' ATM assets under Defendants' SwypCo account.

---

[18] *Mackintosh v. Cal. Fed. Sav.*, 935 P.2d 1154, 1162 (Nev. 1997) ("Allowing both recision [sic] and damages for breach of contract would constitute double recovery."); *Bergstrom v. Estate of DeVoe*, 854 P.2d 860, 862 (Nev. 1993) ( "[A plaintiff may] demand alternative remedies, [but is] not entitled to both forms of relief because obtaining both rescission and damages for breach of contract constitutes a double recovery."); 11 *Corbin on Contracts* § 55.6, at 21 (rev. ed. 2005) ("[A] plaintiff may not recover both restitution and damages for breach of contract.").

[19] *Barmettler v. Reno Air, Inc.*, 956 P.2d 1382, 1386 (Nev. 1998).

[20] *Nev. Power Co. v. Monsanto Co.*, 891 F. Supp. 1406, 1420 (D. Nev. 1995)

However, Plaintiffs operated and controlled the Las Vegas ATM assets from March 2019 until MTE asserted control over them in November 2020. There is no evidence that Defendants retained control over Plaintiffs' assets during that timeframe. Michael ran the day-to-day operations of the Las Vegas ATM assets, not Defendants. Additionally, Defendants did not receive profits from the Las Vegas ATM assets. The only profits Defendants received were from contracts they helped procure independently of the APA. Moreover, the text messages Tyler sent to Michael were not Tyler asserting control over and managing Michael but rather helping Michael to transition the ATM customers.

Defendants' actions in November 2020, reasserting control over the Las Vegas ATM assets, are too remote to the execution of the APA to serve as evidence for misrepresentation. Instead, Defendants' actions reflect an ad hoc decision to promptly capitalize on an unexpected opportunity arising from Michael's death, not an elaborate scheme spanning over a year and a half. Because Defendants did not assert possession or control over the Las Vegas ATM assets until November 2020, Defendants did not misrepresent in March 2019 that it was selling its ATM assets and relinquishing control over those assets. Therefore, the Court is without evidence that Defendants made misrepresentations that induced Plaintiffs into executing the APA. Consequently, Plaintiffs fail to prove fraudulent misrepresentation by clear and convincing evidence under these facts.

Additionally, Defendants did not assert control over the Las Vegas ATM assets from March 2019 to November 2020 by placing the assets within MTE's "tree." Defendants had access to the SwypCo reports of the Las Vegas ATM assets but there is no evidence that the access was used to maintain control over those assets. Additionally, Tyler recommended Plaintiffs utilize SwypCo but there is no evidence that Defendants induced Plaintiffs to act or refrain from acting

upon the fact that they were placed within MTE's "tree" in SwypCo. Plaintiffs were not hindered or prevented from introducing Mizer, their cash loader, to SwpCo, or to give Mizer control over their ATMs, including the ability for him to change their passcodes. As such, the Court is without evidence as to how Defendants induced Plaintiffs to act or refrain from acting upon the fact that they were placed within MTE's SwypCo "tree." Therefore, Plaintiffs fail to prove fraudulent misrepresentation by clear and convincing evidence under these facts.

Because Plaintiffs fail to prove the necessary elements of fraudulent misrepresentation, the Court enters judgment in favor of Defendants on this claim.

**D.    Tortious Interference with Business Relationships**

Plaintiffs raise a tortious interference with business relationships claim against MTE and Tyler. Under Nevada law, a tortious interference with business relationships claim requires plaintiffs to show "(1) a valid contract existed between the plaintiff and a third party; (2) the defendant knew of the contract, (3) the defendant committed intentional acts intended or designed to disrupt the contractual relationship; (4) an actual disruption of the contract; and (5) the plaintiff sustained damages as a result."[21] Because interference with business relations is an intentional tort, "the plaintiff must demonstrate that the defendant knew of the existing contract, or at the very least, establish 'facts from which the existence of the contract can reasonably be inferred.' "[22]

"At the heart of an intentional interference action is whether Plaintiff has proved *intentional acts by Defendant* intended or designed to disrupt Plaintiff's contractual relations."[23] "[T]he plaintiff must establish that the defendant had a motive to induce breach of the contract with the

---

[21] *Randazza v. Cox*, 2014 WL 2123228, at *6 (D. Nev. May 21, 2014) (citation omitted).

[22] *J.J. Indus., LLC v. Bennett*, 71 P.3d 1264, 1267 (Nev. 2003).

[23] *Id*. at 1268 (brackets and ellipses omitted) (emphasis in original) (further citations and quotations omitted).

third party."[24] The inquiry into the defendant's motive usually "concerns the defendant's ultimate purpose or the objective that he or she is seeking to advance."[25] "Thus, mere knowledge of the contract is insufficient to establish that the defendant intended or designed to disrupt the plaintiff's contractual relationship."[26]

Further, "[i]t is fundamental in the law of torts that there be some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered."[27] Consequently, the damages that plaintiff suffers must be related to the defendant's disruption of the contract between plaintiff and the third party.[28]

Here, Plaintiffs assert Defendants tortiously interfered with their business relationships under two theories: (1) interfering with Plaintiff's contracts with their Las Vegas ATM customers; and (2) interfering with their cash loading agreement with Mizer. The Court will address each theory in turn.

### 1.    Contracts with Las Vegas ATM Customers

The first theory Plaintiffs assert against Defendants under this claim is that Defendants tortiously interfered with their business relationships with their Las Vegas ATM customers. Plaintiffs had valid contracts with their Las Vegas ATM customers, concerning the 38 machines they owned in November 2020. Defendants argue that these contracts were not with Plaintiffs but

---

[24] *Id.*

[25] *Id.*

[26] *Id.*; *see also Las Vegas Invs. Grp. v. Pac. Malibu Dev. Corp.*, 867 F. Supp. 920, 925 (D. Nev. 1994) ("[I]t is clear that '[o]ne does not induce another to commit a breach of contract with a third person . . . when he merely enters into an agreement with the other with knowledge that the other cannot perform both it and his contract with the third person.' " (quoting Restatement (Second) of Torts § 766 cmt. n (1976))).

[27] *Churchill v. Barach*, 863 F. Supp. 1266, 1276 (D. Nev. 1994) (applying this fundamental to claims of tortious interference).

[28] *Id.*

instead with Defendants because there was only an agreement for Michael to cash load, not an agreement for the sale of MTE's ATM assets. As the Court ruled above, the agreement was for the sale of MTE's Las Vegas ATM assets. Thus, Defendants' argument carries no weight in the analysis. Consequently, Plaintiffs meet the first element.

Under the second element, Plaintiffs must prove that Defendants knew of the contracts with the Las Vegas ATM customers. Defendants knew of the contracts with the Las Vegas ATM customers for the 25 Las Vegas ATM assets that were acquired by Plaintiffs from MTE. Additionally, Defendants helped Plaintiffs establish contracts with ATM customers for some of the remaining 13 Las Vegas ATM assets. Moreover, Defendants had access to the SwypCo reports of the Las Vegas ATM assets, and thus, would know of any other contract with Las Vegas ATM customers. Therefore, Plaintiffs have provided sufficient evidence from which this Court can draw a reasonable inference that Defendants knew of the existing contracts with the Las Vegas ATM customers.

The third element requires Plaintiff to prove intentional acts by the Defendants that were intended or designed to interrupt the contractual relationships with the Las Vegas ATM customers. Tyler told Patrick that he contacted Las Vegas ATM locations that were customers of MoneyBox and obtained new contracts between the ATM customers and MTE. At the same time Defendants were securing new contracts with the ATM customers, Defendants were also asserting control over Plaintiffs' Las Vegas ATM assets and locking Plaintiffs out of their online operating accounts. The actions of obtaining new contracts with the Las Vegas ATM customers and locking Plaintiffs' out of their operations serve as evidence of Defendants' intent and design to interrupt Plaintiffs' contractual relationships with the Las Vegas ATM customers. As such, Plaintiffs prove the third element.

Plaintiffs must prove an actual disruption of the contracts with the Las Vegas ATM customers under the fourth element. The contracts with the Las Vegas ATM customers concerning the 38 ATM assets brought in approximately $7,700 per month of net profits. After Defendants' actions, those Las Vegas ATM customers no longer conducted business with Plaintiffs and Plaintiffs stopped receiving the net profits from those contracts. The lost customers, and accompanying profit, evidences a disruption sufficient to meet the fourth element.

The final element requires Plaintiffs to prove that the damages they suffered were reasonably related to Defendants' disruption of the contracts with the Las Vegas ATM customers. Plaintiffs assert Defendants' disruption caused them lost revenue from the Las Vegas ATM customers. As noted above, the contracts with Las Vegas ATM customers brought in profits of about $7,700 per month. Plaintiffs no longer received those profits after Defendants disrupted their contracts with the Las Vegas ATM customers. Thus, the lost revenue is reasonably related to Defendants' disruption of contracts. Consequently, Plaintiffs prove the last element relating to the damages of lost revenue.

The Court finds that Plaintiffs have proven by a preponderance of the evidence a tortious interference with business relationships claim under this theory as it relates to the damages of lost revenue.

Plaintiffs also assert that Defendants' disruptions prevented Plaintiffs from being able to sell their Las Vegas ATM assets. Plaintiffs fail to prove that loss of the ability to sell their Las Vegas ATM assets is reasonably related to Defendants' disruption of the contracts with the Las Vegas ATM customers. The contracts with the Las Vegas ATM customers related to the services provided via the Las Vegas ATM assets. These contracts were not for the sale of the ATM assets. Further, there is no evidence that any of Plaintiffs' Las Vegas ATM customers had a contract to

purchase the Las Vegas ATM assets or were even interested in buying the assets. Therefore, the loss of the ability to sell the Las Vegas ATM assets is not reasonably related to the disruption of the Las Vegas ATM customer's contracts with Plaintiffs. As such, Plaintiffs fail to prove by a preponderance of the evidence a tortious interference with business relationships claim under this theory as it relates to the alleged damages of the loss of the ability to sell their Las Vegas ATM assets.

"[W]hile plaintiffs are permitted to plead alternative or different theories of relief based on the same facts, plaintiffs may not recover more than their "total loss plus any punitive damages assessed."[29] Therefore, the damages, not including punitive damages, awarded under the tortious interference with business relationships claim must be distinct from the damages awarded under the breach of contract claim.[30]

The Court has already awarded damages for the lost profits stemming from 25 of the Las Vegas ATM assets. Thus, damages are only available for the remaining 13 Las Vegas ATM assets.[31]

From September 2019 to September 2020, the contracts with the Las Vegas ATM customers concerning the 38 ATM assets brought in approximately $7,700 per month of net profits. Those net profits are from Plaintiffs' operation of 38 Las Vegas ATM assets. As noted above, the Court is without evidence of what each specific ATM asset netted for profits each month, and thus, will calculate the lost profits by equally dividing the $7,700 net profits per month

---

[29] *Countrywide Home Loans, Inc. v. Thitchener*, 192 P.3d 243, 248 (Nev. 2008).

[30] *Id*. at 248–49.

[31] The Court recognizes that punitive damages may also be available; however, the Court will address the analysis for punitive damages later on in this Order.

between all ATM assets. The net profits per month, $7,700, divided by the number of Las Vegas ATM assets, 38, is $202.63. Thus, each Las Vegas ATM asset netted approximately $202.63 of profit each month. As noted above, 13 of those Las Vegas assets remain as a basis for damages calculations. Therefore, the Court multiplies the $202.63 by 13 for a total of $2,634.19. Accordingly, Plaintiffs are entitled to lost revenue damages of $2,634.19 per month from December 2020 to the date of the entry of final judgment in this matter, which is $136,977.88 through April 21, 2025.

The Court enters judgment in favor of Plaintiffs on this claim and awards $136,977.88 of lost revenue damages. As noted above, the Court directs Plaintiffs to allocate the award of damages between themselves.

2.    *Contract with Mizer*

The second theory Plaintiffs assert against Defendants under this claim is that Defendants tortiously interfered with their business relationship with Mizer. Plaintiffs had a cash loading agreement with Mizer that they argue Defendants tortiously interfered with when Defendants hired him as a cash loader for the Las Vegas ATM assets that Defendants improperly asserted control over. However, Plaintiffs cannot prove that the damages they suffered were reasonably related to Defendants' disruption of their cash loading contract with Mizer. Plaintiffs assert Defendants' disruption caused them to lose revenue from the Las Vegas ATM assets and prevented Plaintiffs from being able to sell those assets. The contract between Plaintiffs and Mizer was for Mizer's services as a cash loader. Plaintiffs did not receive profits from this contract with Mizer. Consequently, the damages of lost revenue are not reasonably related to the disruption of Mizer's contract.

Further, while Plaintiffs were negotiating with Mizer the possibility of selling their Las Vegas ATM assets to him, an agreement was never reached because Mizer was uncertain as to the validity of the APA. Moreover, Mizer's cash loading contract did not concern the sale of the Las Vegas ATM assets. Thus, the damages of losing the ability to sell the Las Vegas ATM assets are not reasonably related to Defendants' disruption of Mizer's contract with Plaintiffs. As a result, Plaintiffs fail to prove by a preponderance of the evidence a tortious interference with business relationships claim under this theory.

## E.    Conversion

Plaintiffs raise a conversion claim against MTE and Tyler. The Court granted summary judgment in favor of MTE on this claim. Therefore, only the conversion claim against Tyler remains.[32] Under Nevada law, "[c]onversion is a 'distinct act of dominion wrongfully exerted over another's personal property.' "[33] "[C]onversion is an act of general intent, which does not require wrongful intent and is not excused by care, good faith, or lack of knowledge."[34] The manual or physical taking of property is not a requirement of conversion.[35] "Rather, conversion is the unlawful deprivation of an owner's property by another who assumes *dominion* over the property."[36]

---

[32] Members of limited liability companies are not shielded from liabilities incurred as a result of individual acts. *See Gardner v. Eighth Jud. Dist. Ct.*, 405 P.3d 651, 655 (Nev. 2017).

[33] *Gaia Ethnobotanical, LLC v. T1 Payments LLC*, 2024 WL 987981, at *5 (D. Nev. Mar. 6, 2024) (quoting *Evans v. Dean Witter Reynolds, Inc.*, 5 P.3d 1043, 1048 (Nev. 2000)).

[34] *Evans*, 5 P.3d at 1048 (citations omitted).

[35] *Gaia Ethnobotanical, LLC*, 2024 WL 987981, at *5 (citing *Bader v. Cerri*, 609 P.2d 314, 317 n.1 (Nev. 1980), overruled, in part on other grounds by *Evans*, 5 P.3d at 1050).

[36] *Id*. (emphasis in original).

Here, Tyler wrongfully exerted control over Plaintiffs' 38 Las Vegas ATM assets. Tyler told Patrick that he contacted Las Vegas ATM locations that were customers of MoneyBox and obtained new contracts between the customers and MTE. Consequently, Plaintiffs were effectively shut out from the operations of the 38 Las Vegas ATM assets.

Tyler argues that he did not take the Las Vegas ATM assets because he paid for them. He testified that he bought ATM assets from a technician selling them on behalf of MoneyBox. The Court finds this testimony self-serving and incredible as Tyler fails to provide evidence to support his assertions. Tyler's testimony is devoid of any details regarding how many ATM assets he purchased or even the amount that he purchased the ATM assets for. As such, the Court declines to find that Tyler purchased the ATM assets instead of wrongfully exerting control over them.

Because Plaintiffs were effectively shut out from the operations of their Las Vegas ATM assets when Tyler wrongfully exerted control over them, the Court finds Plaintiffs have proven by a preponderance of the evidence a conversion claim against Tyler.

For conversion claims, damages are the "the sum of 'the full value of the property at the time of conversion'; lost-business value; and if fraud, malice, or oppression are alleged, punitive damages."[37] However, "[w]hile plaintiffs are permitted to plead alternative or different theories of relief based on the same facts, plaintiffs may not recover more than their 'total loss plus any punitive damages assessed.' "[38] Therefore, the damages awarded under the conversion claim

---

[37] *Great Nature v. Ewing Bros.*, 2022 WL 575745, at *3 (D. Nev. Feb. 25, 2022) (citations omitted).

[38] *Countrywide Home Loans*, 192 P.3d at 248 (quoting *Topaz Mutual Co. v. Marsh*, 839 P.2d 606, 610 (Nev. 1992)).

must be distinct from the damages awarded under the breach of contract claim and the tortious interference with business relationships claim.[39]

Here, the Court has already awarded damages for the value of 25 of the Las Vegas ATM assets and the lost profits stemming from those assets under the breach of contract claim. Additionally, the Court has awarded damages for lost profits of the remaining 13 Las Vegas ATM assets under the tortious interference with business relationships claim. Thus, damages are only available for the value of the remaining 13 Las Vegas ATM assets.[40]

Plaintiffs' Las Vegas ATM assets were valued at $350,000 by an ATM broker in November 2020. However, the $350,000 includes the 25 ATM assets that have already been the basis for damages. As such, the Court has to calculate the value of the remaining 13 Las Vegas ATM assets.

The appraised amount, $350,000, divided by the number of Las Vegas ATM assets, 38, is approximately $9,210.53. Consequently, each of Plaintiffs' Las Vegas ATM assets are worth $9,210.53. Because 13 Las Vegas ATMs remain, the Court multiplies the $9,210.53 by 13 for a total of $119,736.89. Thus, Plaintiffs are entitled to $119,736.89 in damages for the market value of the Las Vegas ATM assets.

The Court enters judgment in favor of Plaintiffs on this claim and awards $119,736.89 of damages for the market value of the Las Vegas ATM assets. As noted above, the Court directs Plaintiffs to allocate the award of damages between themselves.

---

[39] *Id*. at 248–49.

[40] As noted above, the Court recognizes that punitive damages may also be available; however, the Court will address the analysis for punitive damages later on in this Order.

### F.    NDTPA

Plaintiffs raise claims of deceptive trade practices under the Nevada Deceptive Trade Practices Act ("NDTPA") against MTE and Tyler. Specifically, Plaintiffs claim that Defendants violated NRS § 598.0915(15). Under the NDTPA, "[a]n action may be brought by any person who is a victim of consumer fraud."[41] The NDTPA does not restrict "victims" to only consumers; rather, business competitors may be considered "victims" for the purposes of the statute.[42] To successfully prove a claim under the NDTPA, a plaintiff must demonstrate that "(1) an act of consumer fraud by the defendant (2) caused (3) damage to the plaintiff."[43]

The NDTPA's definition of consumer fraud includes "a deceptive trade practice as defined in NRS 598.0915 to 598.0925, inclusive."[44] "A person engages in a 'deceptive trade practice' if, in the course of his or her business or occupation, he or she . . . [k]nowingly makes [a] false representation in a transaction."[45] Under the NDTPA, "knowingly" "does not require that the defendant intend to deceive with the act or omission, or even know of the prohibition against the act or omission, but simply that the defendant is aware that the facts exist that constitute the act or omission."[46]

---

[41] NRS § 41.600(1).

[42] *S. Serv. Corp. v. Excel Bldg. Servs., Inc.*, 617 F. Supp. 2d 1097, 1099–1100 (D. Nev. 2007).

[43] *Picus v. Wal-Mart Stores, Inc.*, 256 F.R.D. 651, 658 (D. Nev. 2009).

[44] NRS § 41.600(2)(e).

[45] NRS § 598.0915(15).

[46] *Poole v. Nev. Auto Dealership Invs., LLC*, 449 P.3d 479, 483 (Nev. App. 2019) ("For example, a defendant auto dealer 'knowingly' makes a false representation of a car's condition to a plaintiff consumer if the car has been damaged in a collision and the dealer is aware that it represented to the consumer that the car has never been damaged in a collision. '[K]nowingly' does not require that the dealer intended to deceive the consumer or knew of such a misrepresentation's prohibition—the defendant must simply be aware of the fact that it represented that the car had never been damaged in a collision."); *Troy Cap. LLC v. Patenaude & Felix APC*, 2022 WL 706898, at *6 (D. Nev. Mar. 1, 2022) (discussing that "knowingly" does not require more than general intent).

Here, Plaintiffs fail to provide evidence that Defendants knowingly made a false representation in the transaction. Plaintiffs argue Defendants fraudulently misrepresented that MTE was selling all of its Las Vegas ATM assets, would relinquish control over those assets, and placed Plaintiffs' ATM assets under Defendants' SwypCo account. As the Court explained above, Defendants' actions in November 2020, reasserting control over the Las Vegas ATM assets, are too remote to the execution of the APA to serve as evidence for misrepresentation.

Defendants' actions reflect an ad hoc decision to promptly capitalize on an unexpected opportunity, not an elaborate scheme spanning over a year and a half.

Because Defendants did not assert possession or control over the Las Vegas ATM assets until November 2020, Defendants did not "knowingly" make a false representation that it was selling its ATM assets and relinquishing control over those assets. Therefore, the Court is without evidence that Defendants "knowingly" made a false representation in the execution of the APA. Consequently, Plaintiffs fail to prove Plaintiffs fail to prove Defendants engaged in deceptive trade practices under these facts.

Because Plaintiffs fail to prove the necessary elements of a NDTPA claim, the Court enters judgment in favor of Defendants on this claim. Plaintiffs also ask for treble damages to be imposed against Defendants on this claim. The Court need not address the request for treble damages as Plaintiffs failed to prove elements of a NDTPA claim by a preponderance of the evidence.

## G.    Punitive Damages

Plaintiffs also ask for punitive damages against Defendants. "Punitive damages are designed not to compensate the plaintiff for harm suffered but, instead, to punish and deter the

defendant's culpable conduct."[47] Nevada law requires bifurcated proceedings for punitive damages.[48] "If punitive damages are claimed . . ., the trier of fact shall make a finding of whether such damages will be assessed. If such damages are to be assessed, a subsequent proceeding must be conducted before the same trier of fact to determine the amount of such damages to be assessed."[49] "A plaintiff is not automatically entitled to punitive damages."[50] Punitive damages are available "in an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud or malice, express or implied."[51]

Plaintiffs argue that Defendants' actions show that they are guilty of oppression. " 'Oppression' means despicable conduct that subjects a person to cruel and unjust hardship with conscious disregard of the rights of the person."[52] " 'Conscious disregard' means the knowledge of the probable harmful consequences of a wrongful act and a willful and deliberate failure to act to avoid those consequences."[53] "Conscious disregard plainly requires evidence that a defendant acted with a culpable state of mind. At a minimum, it must exceed mere recklessness or gross negligence."[54]

---

[47] *Bongiovi v. Sullivan*, 138 P.3d 433, 450 (Nev. 2006).

[48] NRS § 42.005(3).

[49] *Id*.

[50] *Bongiovi*, 138 P.3d at 450.

[51] NRS § 42.005.

[52] NRS § 42.001(4).

[53] NRS § 42.001(1).

[54] *Dobson v. Sprint Nextel Corp.*, 2014 WL 553314, at *8 (D. Nev. Feb. 10, 2014) (brackets and ellipses omitted) (quoting *Countrywide Home Loans*, 192 P.3d at 255).

Here, punitive damages are available for Defendants' actions in tortiously interfering with Plaintiffs' business relationships with the Las Vegas ATM customers and conversion of the Las Vegas ATM assets. There is strong evidence that Defendants made the conscious decision to usurp Plaintiffs' contracts with the Las Vegas ATM customers and their operation of the Las Vegas ATM assets. Defendants' actions certainly subjected Plaintiffs to "cruel and unjust hardship" as they prevented Plaintiffs from operating their Las Vegas ATM business. Plaintiffs were unable to gain access to their Las Vegas ATM assets, including receiving profits, because Defendants had asserted control over those assets and effectively locked Plaintiffs out of their business. Thus, Defendants' actions subjected Plaintiff to cruel and unjust hardship.

Defendants also acted with conscious disregard. When Plaintiffs discovered they were effectively locked out of the operations of their Las Vegas ATM assets, Patrick called Tyler to question him about what happened. On the phone call, Tyler advised that he was going to tell Patrick something that "will shock you." Tyler then explained that he had contacted Las Vegas ATM locations that were customers of Plaintiffs and obtained new contracts between those customers and MTE. Tyler's words evidence that it was a conscious decision to lock Plaintiffs out from their Las Vegas ATM operation. Further, the timing of Defendants' actions show that it was intentional. Defendants took advantage of Patrick's nose surgery and recovery to assert control over Plaintiff's Las Vegas ATM assets and usurp the contracts with the Las Vegas ATM customers. As such, there is ample evidence to support a punitive damage judgment based on oppression. Therefore, the Court will hold a hearing at 1:00 p.m. on May 15, 2025, to determine the amount of punitive damages to be assessed. During this hearing, the Court will hear arguments

from the parties and Defendants will have the opportunity to present evidence regarding their financial condition.[55]

**H.    Attorney's Fees**

Plaintiffs seek to recover attorney's fees on all claims that allow for attorneys' fees. However, Plaintiffs' request is premature since they have not yet filed a motion for attorney's fees as required by Federal Rule of Civil Procedure 54(d)(2). As such, this issue is not before the Court and the Court will not consider it at this time.

**IT IS THEREFORE ORDERED** that judgment is entered in favor of Plaintiffs on the breach of contract claim, and Plaintiffs are awarded $230,263.25 for consequential damages and $263,419 for lost profits.

**IT IS FURTHER ORDERED** that Plaintiffs' claims against MTE for equitable recission, recission based on mutual mistake, and unjust enrichment are barred by the doctrine of double recovery.

**IT IS FURTHER ORDERED** that judgment is entered in favor of Defendants on the fraud and fraudulent misrepresentation claim.

**IT IS FURTHER ORDERED** that judgment is entered in favor of Plaintiffs on the tortious interference with business relationships claim, and Plaintiffs are awarded $136,977.88 for lost revenue damages.

**IT IS FURTHER ORDERED** that judgment is entered in favor of Plaintiffs on the conversion claim, and Plaintiffs are awarded $119,736.89 for the market value of the Las Vegas ATM assets.

---

[55] *See* NRS § 42.005(4).

**IT IS FURTHER ORDERED** that judgment is entered in favor of Defendants on the NDTPA claim.

**IT IS FURTHER ORDERED** that punitive damages are available to Plaintiffs, and a hearing will be held at 1:00 p.m. on May 15, 2025, to determine the amount of punitive damages to be assessed.

**IT IS SO ORDERED.**

Dated this 21st day of April, 2025.

ERIC F. MELGREN
CHIEF UNITED STATES DISTRICT JUDGE